UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELEMENT SNACKS, INC.<br>    *Plaintiff*,<br><br>    v.<br><br>GARDEN OF LIGHT, INC., d/b/a<br>BAKERY ON MAIN<br>    *Defendant*. | Civil Case Number<br><br>3:18-cv-1128 (VLB)<br><br>August 9, 2018 |

## MEMORANDUM OF DECISION GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DKT. 2]

Before the Court is a Motion for Preliminary Injunction on which the Court conducted an evidentiary hearing on August 1, 2018 (the "Hearing"). Plaintiff seeks to maintain the *status quo* prior to its contractual dispute with Defendant until the parties' arbitral proceedings conclude. [Plaintiff's Mot. for Preliminary Injunction, Dkt. No. 2-1, at 2]. Plaintiff, Element Snacks, Inc. ("Element"), is a New York corporation which sells organic rice cake snack food products. [Affidavit of Nadia Leonelli, Dkt. No. 24, ¶ 2]. Defendant, Garden of Light, Inc., doing business as Bakery on Main ("Bakery"), is a "co-packer" – a company that works with businesses like Element to co-manufacture and co-pack food products. [Dkt. No. 24, ¶ 6]. The dispute concerns Bakery's threatened termination of the parties' contract for Bakery to manufacture Element's products. Element contends that it will suffer irreparable harm if Bakery is allowed to terminate the contract. [Dkt. No. 2-1, at 9].

1

I. **Factual Background**

The following facts are taken from the record and from the evidence introduced at the Hearing. Element and Bakery executed a written Manufacturing Agreement on October 25, 2016 under which Bakery agreed to manufacture specialty rice cakes to Element's specifications (the "Agreement."). [Complaint, Dkt. No. 1, ¶ 9]. Bakery warranted:

> The Products as delivered to Company will conform to the Specifications, be free of all material defects arising from improper manufacture and handling, including contamination, and be unadulterated and fit for consumption by humans. As shipped to Company, the Products will be packaged and appropriately marked for lot code identification and date of manufacture in accordance with applicable Law and Company's specifications.

[Manufacturing Agreement, Dkt. No. 1-1, § 1(a)(iii)]. Element made no representations or warranties concerning the equipment or ingredients the contract required Bakery to use.

The Agreement specifies the price Element is obligated to pay Bakery and the method for adjusting the price. [Dkt. No. 24, ¶ 11; *See* Dkt. No. 1-1, §§ 2(a), 2(b)].

The Agreement further describes the composition of the price:

> Except for chocolate, which will remain fixed during each calendar quarter, the Production Materials cost component of the Price will remain fixed during each six (6) month period of the Term (as hereinafter defined), with Manufacturer assuming whatever gains or losses may result from price fluctuations in the cost of Production Materials during such period. Manufacturer shall, at least fifteen (15) days before the start of any such six month period, provide Company with updated Production Material costs by providing a detailed cost sheet for each Product and any other documentation reasonably requested by company.
>
> . . .
>
> Company will, prior to the commencement of each six month period, agree upon the actual cost of the Production Materials that will be incorporated into the Price of the Products for the next six month period.

2

**[Dkt. No. 1-1, §§ 2(a)].**

> **The Parties acknowledge and agree that, except as set forth below, the "Price" payable for the Products shall include all of Manufacturer's costs and expenses related to the production and packaging of the Products, including without limitation, labor, overhead, purchase of Production Materials, receipt, unloading and warehousing of Production Materials, performance of the manufacturing and packaging activities (in bulk (i.e., in corrugated shippers), in retail carton and/or for retail sale), application of labeling, warehousing of the Products, loading the Products onto a trailer for transport, disposal of related waste, insurance and profit. The Price payable for the Products shall not include any costs or expenses relating to the tooling, packaging, set-up, plant trials (which shall be conducted prior to production), or third party laboratory testing relating to the Products or Production Materials (which manufacturer shall perform upon Company's written directive). Any costs and expenses relating to the foregoing shall be pre-approved by Company.**

**[Dkt. No. 1-1, § 2(b)].**

**The parties agreed that this price would be fixed for six-month periods:**

> **Labor costs will be reviewed annually and an adjustment thereto will be implemented, based on demonstrable increases or decreases in labor costs, ninety (90) days after notice of adjustment is delivered to Company. Price Component pricing will be reviewed every six (6) months, adjusted when necessary, and implemented in accordance with Section 2(a).**

**[Dkt. No. 1-1, § 2(c)].**

> **The Agreement has a three-year term commencing on October 25, 2016.**

**[Dkt. No. 1-1, Preamble]. The Agreement establishes a process for renewal:**

> **Except as otherwise set forth in this Agreement, the obligation of Manufacturer to provide Products to Company pursuant to this Agreement, and Company's obligation to purchase the Products ordered from Manufacturer pursuant to Purchase Orders, shall commence on the Effective Date and continue until the third anniversary of the Effective Date (together with any renewal terms, the "Term"). Thereafter the term shall renew for successive terms of one (1) year unless either Party provides a non-renewal notice at least one hundred eighty (120) [*sic*] days prior to the expiration of the initial term or any renewal term. Such notice shall be effective as of the last day of the initial term or renewal term. Each twelve (12) month period during the term of this Agreement shall be considered a contract year.**

[Dkt. No. 1-1, § 3(a)].

The Agreement obligates Element to purchase equipment for the production line to manufacture the products. [Dkt. No. 1-1, § 42]. The parties jointly discussed specifications for production equipment with the equipment manufacturers. [Dkt. No. 24, ¶¶ 22-23]. After a brief testing period in Italy, the equipment was delivered to Bakery's facility on May 8, 2017. [*Id.* at ¶¶ 24-28]. Following the delivery and installation of the equipment, the parties started initial production runs. [Dkt. No. *Id.* at ¶¶ 32-36]. The parties adjusted the cost and pricing calculations in the Agreement based on these production runs. [*Id.* at ¶¶ 36, 38].

Following the initial production runs, Bakery submitted a Price proposal to Element in 2017. [Dkt. No. 24, ¶ 36]. Element accepted this proposal. [*Id.* at ¶¶ 42-43]. Element alleges that its acceptance of this proposal established the Price for the following six months. [*Id.*]. Thereafter, the terms of the Agreement dictated that the Price should remain at the September 2017 level until March 2018. Section 2(c) of the Agreement reads, in pertinent part: "Price Component pricing will be reviewed every six (6) months, adjusted when necessary, and implemented in accordance with Section 2(a)." [Dkt. No. 1-1, § 2(c)]. Bakery should have waited to negotiate any Price change as required by the Agreement, which states: "Manufacturer and company will, prior to the commencement of each six month period, agree upon the actual cost of the Production Materials that will be incorporated into the Price of the Products for the next six month period." [Dkt. No. 1-1, § 2(a)].

In spite of the preliminary production runs and the September 2017 Price negotiations, the parties continued to dispute the Price. In October and November of 2017, Bakery requested adjustments in the Price, citing increased costs. [Dkt. No. 1-1, ¶ 44]. In December 2017, Bakery sent an invoice with a Price that Element rejected. [*Id.* ¶ 50]. The parties continued to negotiate Price between December 2017 and June 2018. [*Id.* ¶ 51]. Element alleges that Bakery's price requests were frequently based on incorrect data or lacked support. [*Id.* ¶¶ 45, 46, 52, 53]. In particular, Element alleges that Bakery's cost overruns are the result of inefficiencies in Bakery's production process, not problems with the production line equipment. [*Id.* ¶¶ 53-54]. Throughout this process, Element continued to pay the amount it understood to be the agreed-upon Price from September 2017. [*Id.* ¶ 55].

In a letter dated June 14, 2018, Bakery's president, Michael Smulders, notified Element's CEO, Nadia Leonelli, that Element was in breach of the Agreement through its failure to honor Bakery's invoices. [Dkt. No. 1-2, at 1]. The letter stated that Element had an overdue balance of $453,590. [*Id.* at 7]. The letter lists a number of issues with Element's purchased production equipment, which bakery alleges Element has failed to address. [*Id.* at 3-5]. Bakery also identified two disputes over products which Element claimed were defective. [*Id.* at 5-6]. Bakery stated that it would terminate the Agreement 20 days from the date of the letter if Element failed to cure the alleged breaches. [*Id.* at 1].

In a letter dated June 18, 2018, Bakery affirmed its intention to terminate the Agreement if Element failed to cure the alleged breaches. [Dkt. No. 1-3, at 2]. In

this letter, Bakery stated that "[t]ermination is not our desired outcome but we see no other option as long as we are not compensated for the production materials and labor as required by the Agreement." [Dkt. No. 1-3, at 1 (emphasis in original)]. Bakery proposed that Element cure its alleged breaches by making an initial payment of $150,000 towards Element's balance of $453,590 and amortizing the debt over the next five months. [*Id.*]

In response, Element filed a Complaint in this Court on July 6, 2018. [Dkt. No. 1]. On the same day, Element filed a Motion for a Preliminary Injunction with attached affidavit of Element CEO Nadia Leonelli. [Dkt. 2]. In addition, Element filed a Motion for Order to Show Cause. [Dkt. No. 3]. Shortly thereafter, Bakery sent Element cost proposals which corrected for previous errors in Bakery's Calculations. [Dkt. No. 36, at [01:37:00-01:39:00] (testimony of Michael Smulders) ("we believe we've corrected everything, and we've re-submitted [the corrected spreadsheets] I believe three and a half weeks ago.")]. This Court issued an Order to Show Cause on July 19, 2018, ordering the parties to appear for a hearing on Plaintiff's Motion for Preliminary Injunction on August 1, 2018. [Dkt. No. 12]. Element filed an Amended Affidavit and Supplemental Memorandum in Support of its Motion on July 27, 2018. [Dkt. Nos. 24 & 25]. In its Supplemental Memorandum, Element alleged that Bakery attempted to formally terminate the Agreement on July 19, 2018. [Dkt. No. 25, at 3]. Bakery filed a response to the Motion and Memorandum in Support on July 31, 2018. [Dkt. Nos. 29 & 30]. In its response, Bakery confirmed its attempt to terminate the Agreement. [Dkt. No. 30, ¶ 2]. For

the following reasons, Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART.

## II. Subject Matter Jurisdiction

The Court first turns to the question of subject matter jurisdiction, which Bakery contests in its Motion to Dismiss [Dkt. Nos. 28 & 29] and its response to the Motion for Preliminary Injunction. [Dkt. No. 30]. Element brings this action claiming diversity jurisdiction under 28 U.S.C. § 1332(a). [Dkt. No. 1-1, ¶ 7]. Element claims that jurisdiction is proper as *i*) Plaintiff is a New York corporation and Defendant is a Connecticut corporation and *ii*) "the matter in controversy exceeds the sum or value of $75,000." [*Id.*]. Bakery claims that Element's suit does not meet the amount in controversy requirement, as "[t]he Plaintiff alleges no damages except for future irreparable harm of an unknown amount." [Memorandum in Support of Defendant's Mot. to Dismiss, Dkt. No. 29, at 1]. Bakery argues that "Plaintiff's complaint fails to allege the value of the right Plaintiff seeks to protect *during the pendency of the arbitration.*" [Dkt. No. 29, at 8 (emphasis in original)]. The Court rejects this argument.

"In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Correspondent Servs. Corp. v. First Equities Corp. of Fla.,* 442 F.3d 767, 769 (2d Cir. 2006) (quoting *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 347 (1977)). In the Second Circuit, this amount is calculated "from the plaintiff's standpoint; the value of the suit's intended benefit or the value of the right being protected or the injury being averted constitutes the amount in controversy when

damages are not requested." *Correspondent Servs. Corp.*, 442 F.3d at 769 (internal quotations omitted). There is "a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.,* 166 F.3d 59, 63 (2d Cir. 1999).

The object of this litigation is Element's viability as a business. Element's Complaint alleges that Element will almost certainly fail if Bakery ceases production. [Dkt. No. 1-1, ¶ 139]. Bakery threatens to attach Element's production line equipment if Element refuses to pay Bakery's claimed past-due amount. [Dkt. No. 1-3, at 3]. Element paid Bakery $250,000 to retrofit its facility with Element's production line equipment. [Dkt. No. 1-1, ¶ 34]. Bakery demands payment of over $450,000. [Dkt. No. 1-1, ¶ 128]. These facts, combined with Element's assertion that the amount in controversy exceeds $75,000 [Dkt. No. 1-1, ¶ 7] and Element's representations at the Hearing that its company is valued at over $2 million [Dkt. No. 36], are sufficient for the Court to find that it has subject matter jurisdiction.

III. <u>Mootness</u>

In Bakery's opposition to the Motion for Preliminary Injunction, Bakery contends that Element's request to prohibit Bakery from terminating the Agreement is moot because "the Defendant has already terminated the Agreement." [Dkt. No. 30, ¶ 2]. Bakery sent Element an email on July 19, 2018, after Element filed its Motion for Preliminary Injunction and after the Court issued an Order to Show Cause, which set a hearing date of August 1, 2018. [*See* Dkt. Nos. 2, 3 & 12]. Bakery's action does not render moot the Plaintiff's request for relief.

8

This Circuit has held that "[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Martin-Trigonia v. Shiff*, 702 F.2d 380, 386 (2d. Cir. 1983); *accord Vertefeuille v. Houde*, Case No. 3:07-CV-323 (JCH), 2008 WL 918449 at *2 (D. Conn. 2008) ("A request for preliminary injunctive relief becomes moot when the relief can no longer be provided."). *See, e.g., Constitution State Challenge, Inc. v. Nyemchek*, Case No. CIV A. 3:00-CV-650 (CFD), 2001 WL 640417 at *7 (D. Conn. 2001) (denying as moot request for preliminary injunction where defendants turned over to plaintiffs property that was the subject of the injunction); *Vertefeuille,* 2008 WL 918449 at *2 (denying as moot an inmate's request to enjoin a prison employee from issuing disciplinary reports against the inmate where the defendant was no longer an employee and no longer reviewed the inmate's disciplinary reports).

No authority supports the proposition that a defendant can evade a preliminary injunction merely by performing the injurious action sought to be enjoined. The status quo at issue in a preliminary injunction is "the last actual, peaceable uncontested status which preceded the pending controversy." *LaRouche v. Kezer*, 20 F.3d 68, 74 n. 7 (2d Cir. 1994) (quoting *Black's Law Dictionary* 1410 (6th Ed. 1990)); *North American Soccer League, LLC. V. United States Soccer Federation, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "To preserve the status quo, a court may require the parties to act or to refrain from acting." *LaRouche,* 20 F.3d at 74.

Here, Bakery asserts, in effect, that the Court cannot issue an injunction maintaining the *status quo* because Bakery itself has altered the *status quo*. In fact, the *status quo* Element seeks to maintain is the parties' relationship prior to

Bakery's cessation of production. Bakery's President, Michael Smulders testified that Bakery has all of the ingredients, equipment, and personnel that it needs to continue producing Element's products once the parties have agreed to a new price. [Dkt. No. 36, at [01:38:00-01:40:00]]. Therefore, restoring this *status quo ante* is well within the Court's power. The request for an order compelling Bakery to perform under the Agreement is not moot.

IV. <u>Ripeness</u>

Along with its request to prevent Bakery from terminating the Agreement, Element requests that Bakery be ordered to "continue to manufacture Element's products pursuant to the Agreement" and "purchase raw materials and ingredients from suppliers to enable it to manufacture Element's products under the Agreement." [Dkt. No. 2, ¶¶ 2 & 3]. Bakery argues that these requests "are not ripe because the Defendant has not failed to fill any proper Orders and the Defendant has not failed to purchase the materials necessary to produce the Plaintiff's product." [Dkt. No. 30, ¶¶ 3 & 4].

The Court does not share these ripeness concerns. Section 7(a) of the Agreement states: "[Bakery] shall purchase and provide to [Element], without additional mark up, all ingredients, raw materials, and packaging necessary to manufacture the Products as specified herein." [Dkt. No. 1-1, § 7(a)]. Element's Motion alleges several instances in which Bakery failed to fill proper orders and failed to purchase necessary materials. [Dkt. No. 2-1, at 5, 8-9; Dkt. No. 25, at 2-3].

In addition, Bakery's assertion of lack of ripeness is incompatible with its argument for mootness. First, Bakery's termination of the Agreement ripens

10

Element's request for an order that Bakery "manufacture Element's products pursuant to the Agreement." [Dkt. No. 2, ¶ 2]. Second, Bakery's obligation to purchase the materials necessary to manufacture the Plaintiff's products is a component of the purportedly-terminated Agreement. [*See* Dkt. No. 1-1, § 7(a)]. If, as Bakery argues, its termination renders moot Element's first request for relief, that same termination ripens Element's second and third requests.

V. <u>Injunctive Relief</u>

To obtain preliminary injunctive relief under F. R. C. P. 65, the moving party must establish "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal quotation marks and citation omitted). The injunction must also be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The value of this standard "lies in its flexibility in the face of varying factual scenarios and the greater uncertainties inherent at the outset of particularly complex litigation." *Citigroup Glob. Markets, Inc.*, 598 F. 3d at 35.

A. <u>*Irreparable Harm*</u>

Element's potential loss of reputation resulting from a failure to fill orders constitutes irreparable harm. An injury is considered irreparable when the Plaintiff demonstrates that it is "non-compensable in terms of money damages." *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d. Cir. 2004). Loss of a business,

representing years of effort and investment, meets this standard. *See Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984) ("the loss of Roso-Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent money damages.").

The moving party is required not only to show the *possibility* of irreparable harm, but that it is "*likely* to suffer irreparable harm if equitable relief is denied." *J.S.G. Trading Corp. v. Tray-Wrap, Inc.*, 917 F. 2d 124 75, 79 (2d Cir. 1990) (emphasis in original). The Second Circuit has held that "in cases where a preliminary injunction has issued to prevent a product source from suspending delivery to a distributor, the irreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from a distributor's inability to supply its customers with the terminated product." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d. Cir. 1990); *see Country Fare LLC v. Lucerne Farms,* 3:11-cv-722 (VLB) 2011 WL 2222315, at *5 (D. Conn. June 7, 2011) ("[I]t is well recognized that the inability of a party to supply its products to customers as a result of a dispute will often result in a loss of goodwill sufficient to establish irreparable harm.").

Irreparable harm to Element is not only possible, but likely, as Bakery's termination threatens Element's ability to supply any of its products. In *Reuters*, the Second Circuit found irreparable harm where United Press was unable to provide its customers with foreign news photographs, which was only one of the

services it offered. *Reuters Ltd.*, 903 F. 2d. at 908. *See also Rex Medical L. P. v. Angiotech Pharmaceuticals (US) Inc.,* 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010) (finding irreparable harm was likely if the plaintiff lost its ability to fill orders for a product which accounted for 90% of its revenue). Bakery manufactures all of Element's products – Element is not capable of manufacturing them itself. [Dkt. No. 2-1, at 3; Dkt. No. 2-2, ¶ 4]. Although it is possible Element could find another co-packer and invest in new production equipment, Element is likely to permanently lose customers in the intervening period.

### B. *Sufficiently Serious Questions for the Merits*

The purpose of a preliminary injunction is "to give temporary relief based on a preliminary estimate of the strength of a plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." *Citigroup*, 598 F.3d at 35. A preliminary injunction therefore is not to be limited just to cases that will more likely than not be successful at trial; otherwise, the "sufficiently serious questions" element would provide no purpose. *See id.* "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.*

Bakery argues that because Element's requested relief alters rather than maintains the *status quo*, Element should be held to the heightened standard of showing a "clear or substantial likelihood of success on the merits" – the standard for "mandatory" injunctions. [Dkt. No. 30, at 2 (citing *Doninger v. Niehoff*, 527 F.3d

13

41, 47 (2d. Cir. 2008))]. As discussed above, the relevant *status quo* is performance of the contract prior to Bakery's alleged refusal to fill orders. *See North American Soccer League, LLC,* 883 F.3d at 38 ("The status quo is the parties' pre-controversy position vis-à-vis the other."). Bakery does not gain a more favorable pleading standard from its own efforts to alter the *status quo* following Element's filing of its Motion. Therefore, the requested injunction is not mandatory, and Element need not meet the heightened standard.

Element has shown that sufficiently serious questions exist for the merits. Element asserts that Bakery refuses to perform in accordance with the parties' contractual pricing arrangement, which provides for a 6-month period during which Element pays Bakery a fixed amount to manufacture Element's products and produce certain materials. [Dkt. No. 2-1, at 4-7; *See* Dkt. No. 1-1, § 2]. Element also contends that Bakery's stated grounds for terminating the contract are meritless. [Dkt. No. 2-1, at 8-9]. The language of the contract calls into question Bakery's legal basis for its requested adjustments in the Price in October and November 2017. [*See* Dkt. No. 24, ¶ 44].

The parties also dispute the process for procuring production materials for Element's products. Element alleges that Bakery failed to pay suppliers for production materials, as required by the Agreement, on several occasions. [Dkt. No. 24, ¶¶ 60-61]. Element argues that the Price accounts for Bakery's costs in procuring the materials, and that Bakery should pay suppliers directly. [Dkt. No. 2-1, at 5-6]. The Agreement supports Element's contention. [*See* Dkt. No. 1-1, § 2(b) ("The Parties acknowledge and agree that . . . the Price payable for the products

shall include all of [Bakery's] costs and expenses related to the . . . purchase of Production Materials.")].

### C. Balance of Hardships

The balance of hardships tips in favor of Element, which will likely fail as a business if the injunction is not granted and Element's only co-packer stops manufacturing its products. Although Bakery states it is producing Plaintiff's products at a loss, Bakery's president testified that his business generates income from contracts with a number of partners besides Element. [Dkt. No. 36].

Element's alleged past due balance does not preclude a finding of the balance of hardships in Element's favor. Bakery's president indicated at the Hearing that he sent corrected pricing calculations to plaintiff as recently as "a few weeks ago." [Dkt. No. 36, at [01:37:00-01:39:00] (testimony of Michael Smulders)]. This would mean that Bakery sent the calculations in early July, approximately the same time Element filed its July 6 Motion and shortly before Bakery's July 19 attempted termination. [*See* Dkt. Nos. 2 & 24]. This period of time is insufficient for Element to adequately evaluate the revisions and agree to a fair price. Furthermore, Bakery's president acknowledged that a portion of Element's alleged outstanding balance due includes losses for which Bakery may be responsible. [Dkt. No. 36, at [02:52:45-02:55:25] (testimony of Michael Smulders)].

Plaintiff requests that Bakery restore full access to Bakery's production facilities by restoring Element's video feed of the production floor and giving Plaintiff's employee a key to most areas of Bakery's building. [Dkt. No. 25, at 2]. It is unclear which provisions of the contract grant Element the right to unfettered

**physical access to Bakery's property. At the Hearing, Bakery expressed legitimate concerns about granting Element full access to the facility while the parties were engaged in a legal dispute. In an effort to assure Element that its product is produced as ordered, the Court orders Bakery to restore Element's access to the video feed and to continue to grant Element access as specified in the contract. The Court does not order Bakery to return a key fob to Element's employee.**

**The Court recognizes the hardship to Bakery of producing Element's product without assurance that Bakery will be paid in full. For that reason, the Court requires Element to post security during the performance of the injunction.**

### D. Public Interest

Granting Element a temporary injunction is in the public interest. "[T]emporary injunctions often foster rather than contradict the policy favoring arbitration. In many instances, it is by freezing the status quo that the meaningfulness of arbitration is best protected." *American Exp. Financial Advisors, Inc. v. Thorley*, 147 F.3d 229, 231 (2d. Cir. 1998). Preserving the *status quo* between Element and Bakery protects the meaningfulness of the Agreement's arbitration provisions and furthers the public interest in promoting arbitration.

### VI. Conclusion

For the foregoing reasons, the Court hereby GRANTS IN PART Plaintiff's Motion for Preliminary Injunction and ORDERS:

1. Defendant to resume manufacturing Plaintiff's products as provided in the Agreement within 48 hours after Plaintiff's counsel notifies

Defendant's counsel that it is in receipt of the security ordered in Paragraph 2 below to be posted by Plaintiff;

2. Plaintiff to place $150,000 in escrow with Plaintiff's counsel as security for Bakery's continued performance; Defendant is not required to resume performance until Plaintiff's counsel notifies Defendant and the Court that such funds have been transferred;

3. Defendant to restore Plaintiff's video access to the production facility within 24 hours of the posting of Plaintiff's security; and

4. Plaintiff to timely make payment as provided in the Agreement for all product deliveries at the September 2017 Price originally agreed to by the parties; these payments shall not be deducted from the security.

This Order shall remain in effect until the parties' arbitrator has issued a final decision. Plaintiff shall provide a copy of this Order to the chosen arbitrator.

**IT IS SO ORDERED.**

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

**Dated at Hartford, Connecticut: August 9, 2018**